**Affirmed and Memorandum Opinion filed October 11, 2019.**



**In The**

# Fourteenth Court of Appeals

**NO. 14-19-00320-CV**
**NO. 14-19-00321-CV**

## IN THE INTEREST OF G.A.A.-G. AND J.S.A.-S., CHILDREN

**On Appeal from the 309th District Court**
**Harris County, Texas**
**Trial Court Cause Nos. 2007-20638 & 2008-39339**

### MEMORANDUM OPINION

The issues in these cases involve whether the jury's findings to terminate a mother's parental rights are supported by legally- and factually-sufficient evidence. This accelerated appeal arises from final orders in which, after a final hearing before a jury, the trial court terminated the parental rights of appellant A.A. (Mother) with respect to her children, G.A.A.-G. (George), J.S.A.-S. (John),[1] and appointed the appellee Department of Family and Protective Services to be the children's sole

---

[1] To protect the minors' identities, we have not used the names of the children, parents, or other family members. *See* Tex. R. App. P. 9.8.

managing conservator. *See* Tex. Fam. Code Ann. § 109.002(a-1); Tex. R. App. P. 28.4 (accelerated appeals in parental-termination cases). John's father relinquished his parental rights, and George's father's rights were terminated in an earlier proceeding. Neither father has appealed the termination of his parental rights. Concluding that sufficient evidence to support the jury's findings, we affirm the final orders of termination.[2]

## I. BACKGROUND

### A. Pretrial Proceedings

These cases began in 2007 with a petition to establish the parent-child relationship between George and his father, F.B.G. The trial court found that F.B.G. was George's biological father. The court appointed Mother and F.B.G. as George's joint managing conservators and ordered F.B.G. to pay monthly child support to Mother. In 2008, the trial court entered an agreed child support order for John in which the court determined that B.S.S. was John's father, named the parents as joint managing conservators, and ordered B.S.S. to pay monthly child support to Mother.

In 2011, in each case, the Department filed a motion to modify conservatorship and petition for protection of a child for conservatorship and termination in a suit affecting the parent-child relationship. The removal affidavits attached to the motions to modify and petitions for termination reflect that the Department received a referral on October 2, 2011 in which physical abuse of John

---

[2] While the trial court signed both final order of termination on July 29, 2013, these orders were not final for the purposes of appeal the trial court signed final orders naming the Department as sole managing conservator of the children on December 20, 2018.

Because this appeal is accelerated (Texas Rule of Appellate Procedure 28.4) and this court should, so far as reasonably possible, ensure that the appeal is brought to final disposition within 180 days of the date the notice of appeal was filed (Rule of Judicial Administration 6.2), we are handing down our opinion and rendering judgments without the appellee's brief.

was reported. John, born May 28, 2008, was found unresponsive in his crib. The referral noted that Mother was the perpetrator of the physical abuse. The Houston Fire Department was called to Mother's residence on October 2, 2011 because John was in cardiac arrest and was experiencing breathing problems. Bruising was observed around John's neck and arms and was inconsistent with Mother's explanation of how the bruises occurred.

The Department's investigation revealed that John had special needs since birth. John had an oxygen machine in the one-bedroom apartment, which was placed adjacent to a litter box "full of cat feces." Mother had been John's sole caregiver and had no explanation for many of the bruises on John's body. Medical staff at Texas Children's Hospital diagnosed John as malnourished and failing to thrive. Scratches, lacerations, and bruises covered John's entire body.

E.C. (Grandmother) arrived at the home earlier on the day of the referral to pick up George. Grandmother left with George shortly before Mother called telling her that John was non-responsive. Grandmother told the investigator that Mother needed a psychiatric evaluation. The referral noted that George was at substantial risk of harm due to Mother's inadequate supervision. Mother voluntarily placed George with a family friend.

At the time of the referral John was diagnosed with respiratory failure, seizures, failure to thrive, multiple bruises, cuts, lacerations, and excoriations over the abdomen, back, and extremities. At that time treating physicians were not certain whether John would survive his injuries.

Grandmother filed a petition in intervention seeking sole managing conservatorship.

**B.     Family Service Plan**

Mother received a family service plan, which required her to:

- attend, actively participate in, and successfully complete a seven-week "Exceptional Parenting" class offered by Escape Family Resources that is designed for parenting children with special needs;

- provide the caseworker with a list of at least three appropriate individuals who will be used for a support system;

- obtain and maintain legal and verifiable employment;

- contact her caseworker at least one time per week;

- attend all court hearings, family visits, and scheduled visitations;

- obtain, pay for, and maintain appropriate housing for herself and her children;

- participate in an anger management course that is at least six to eight weeks in length;

- participate in a psychosocial evaluation; and

- attend and actively participate in individual therapy.

**C.     Final Hearing**

Eric Holmes, a Department investigator, was the child-fatality investigator when the case was first received in October 2011. The child-fatality unit of the Department investigates child deaths that have occurred as well as children that are believed to be abused and may die as a result of the abuse. Holmes was called because John's injuries were such that his treating physicians thought he might die within 24 hours. Holmes received a report that John, three-years old at the time, was found in cardiac arrest and was covered with bruises, especially around his neck and wrists. The nature of John's bruises reflected that John may have been bound. Photographs of John's appearance on the day of the referral were admitted into evidence without objection.

4

Holmes spoke with Grandmother at the hospital. Grandmother expressed concern about Mother's mental health and stated that Mother needed a psychiatric evaluation. Grandmother reported that Mother had denied her access to John and that Mother's apartment smelled of cat urine. Grandmother speculated that medication Mother was taking may have caused her to injure John. Mother was taking an antidepressant and a sleep aid.

Holmes spoke with Mother, who gave inconsistent stories about the potential causes of John's bruises. Mother found John unresponsive in his crib at 4:00 in the afternoon. When Holmes first asked Mother how John got the bruises, Mother responded, "I don't know what to tell you." Then Mother reported that John had fallen down a couple of steps two weeks earlier and injured his ankle. Mother said she did not notice the injury to John's ankle until medical personnel pointed it out to her. Mother reported that therapists came into the home four days a week to help John with his physical development.

At the time of the investigation George had been living with Mother. Holmes also interviewed George who told Holmes that John had been locked in the closet by Mother and that she would hit John while he lay in his crib. In addition to making the referral to the Department, Holmes contacted law enforcement to follow up on potential criminal charges.

John's pediatrician, Dr. Jennifer Macia, testified that John had been born prematurely and had chronic lung disease. At six-months old when Macia first treated John, he had some brain damage and problems with irritability and feeding. John was fed through a tube known as a G-tube because he had difficulty swallowing. John was a medically fragile child who was prone to lung problems such as pneumonia or asthma. Macia recommended that Mother take John to several specialists for issues involving his heart, eyesight, and hearing. The hospital had no

record of John being seen by any of the specialists. John had progressed while in Macia's care but seemed to plateau from approximately 19 months old to 28 months old.

Macia visited John in the hospital a few days after the referral. Macia was very concerned about the symmetric marks around John's wrists and ankles because it appeared that John had been restrained. One of the photographs admitted into evidence, and shown to Macia during her testimony, reflected that the skin was gone around one of John's ankles. Another photograph showed a bruise and cut on one of John's eyes. Macia testified that the photographs also showed bruises of varying ages on John indicating that the injuries had been incurred at different times. When Macia saw John in the hospital she was not sure he would survive.

Mother explained that the bruises on John's abdomen were a result of her attempt to replace the G-tube and secure the tube with household tape. Mother reported that the balloon that holds the G-tube in place had deflated three days earlier. Macia testified that the deflated balloon was an indication that Mother should have taken John to the emergency room to have a new G-tube inserted immediately. Mother also explained that John fell as he was getting out of the bath. According to Macia, Mother's explanations were not consistent with the bruising on John's body.

Macia testified that if John had been properly cared for and eating properly, he would not have been in the condition he was in at the time he was hospitalized. If Macia had seen bruises on a child like those suffered by John she would have reported potential abuse to the Department. A prudent parent who had been trained on the use of a G-tube, as Mother had, would have immediately sought medical attention when the tube fell out and the balloon deflated.

Jeanine Graf was the attending physician the night John was admitted into the intensive care unit at Texas Children's Hospital. Graf is an associate professor at

Baylor College of Medicine and intensive care liaison for the child protection committee at Texas Children's Hospital. John came to the intensive care unit through the emergency room where he received immediate life-support treatment. When Graf first saw John she noted that he was "a frail, poorly nourished looking child who was on a breathing machine, who had multiple marks all over his body." The marks on John's body were not consistent with an average child or a special-needs child falling or playing, and were in unusual places. Graf testified that the marks did not fit the stories Mother reported. Shortly after John arrived in the ICU he suffered a seizure. Because John's injuries appeared to have been caused by abuse or neglect Graf reported his condition to the Department.

In documenting John's injuries Graf observed a bruise on John's head on the left side of his temple, a bruise on the area in front of his left ear, and an abrasion between the left side of his nose and eye. Graf could not see John's neck because he was wearing a collar to protect against potential injury to his neck. Graf further observed a small laceration at the side of John's clavicle, and scrapes, scratches, and bruises on the right side of his body. The area around John's G-tube looked like an open wound that was seeping. John had two bruises on his left interior hip and fingerprint-like bruises on both thighs. John had marks encircling both ankles and a bruise on the top of his foot. On John's back he had multiple, small superficial lacerations between his armpit and hip. He had bruises on the middle of his back and his hip, and ligature marks around both wrists.

Graf testified that when John came to the hospital he was in organ failure, which is caused by lack of delivery of blood to appropriate places or lack of the ability to breathe. John's breathing was failing and his blood pressure was falling, which indicated his heart and lungs were failing. John was also severely dehydrated. Blood tests revealed that John had not been receiving regular nutrition. If John had

7

not come into the hospital when he did he most likely would have died within 24 hours.

When Graf asked Mother about John's injuries Mother responded that John had been ill for four days with gagging and coughing after feeding. Mother called 911 when she found John limp and pale. When asked about John's bruises Mother reported that she had fallen while holding John as she got out of the bathtub. Mother reported that John fell on his back. Mother's explanation would only explain the bruises on John's back; it did not explain all the other bruises, lacerations, and ligature marks.

In Graf's opinion John's injuries were caused by child abuse and could not have been caused by anything else. Graf explained that John's skin had manifestations that were inconsistent with Mother's explanations.

John's father, (Father) who executed a voluntary affidavit of relinquishment, testified that shortly after John was born Father's parentage was adjudicated and he began paying child support. A Department caseworker contacted Father to tell him that John had been placed in the Department's care. The Department developed a service plan for Father with which Father complied. Father continued to have contact with John and noticed improvement in John's condition since he came into the Department's care. Father described the change as, "It went from a bag of bones to a full healthy, loveable child who can actually enjoy his life now." Father observed John with John's foster father and was impressed by their relationship and the improvements John made progress with the foster father, including toilet training and eating solid food.

Father testified that it was in both children's best interest to live with the foster family rather than with Grandmother. Father described two occasions in which he had to pick up Grandmother because she was too drunk to drive. Father also noted

that if the children were placed with Grandmother there was a good chance that Grandmother would not protect the children from Mother.

When Father asked Mother how John was injured Mother refused to tell him. Father testified that it appeared to him John was "abused and neglected in a way, shape and form that no child deserves." Although Father was not George's biological father he noticed that the two boys had bonded as brothers.

Stacy Head, a social worker with Texas Children's Hospital, testified that she was contacted by the Department and police while John was on his way to the hospital. When Head arrived at the emergency room her role was to support Mother and ensure that Mother knew of the resources available to her. Head asked who lived in Mother's home and asked whether John was covered by Medicaid or private insurance. Head also asked about drug or alcohol history and any Department history. Mother reported that she lived alone with her two sons and some cats in the home. Her sources of income were through child support and financial support from Grandmother. Mother reported history with the Department in that John had previously been hospitalized and a referral was made to the Department at that time. Mother also admitted a previous conviction for driving while intoxicated. When John was moved to the ICU, Head observed the doctors and nurses examining John. Head observed multiple bruises and lacerations and described John as being in "really, really bad shape."

Grandmother testified that she helped care for George since birth. Mother never denied her access to George. When John was born he had to be transferred to another hospital where he stayed approximately one month. Later John went back into the hospital for approximately eight months at which time the Department was notified. Grandmother told the Department at that time that she was part of Mother's support system and that she would help Mother with the children. Grandmother

9

provided financial support in addition to helping care for the children.

In 2010 both boys and Mother lived with Grandmother for a year. Beginning in 2011 Mother and the children moved into their own apartment. Afterward Grandmother spent time with George but not John. Grandmother observed that Mother put socks on John's hands and taped the socks around his wrists. Mother also taped John's pant legs around his ankles. Grandmother did not believe that John did had ligature marks from the tape around his wrists and ankles. She explained that Mother taped John's hands and feet to prevent him from pulling out the button used to attach the G-tube.

In the month leading up to the Department referral, Grandmother testified that Mother had not allowed Grandmother access to John. Grandmother testified that Mother "was not wanting to share anything at all." Grandmother admitted Mother was wrong in failing to take John to the hospital sooner.

John was born at 31-weeks' gestation weighing approximately two pounds nine ounces. His lungs were not fully developed and he had difficulty swallowing. Mother testified that John was hospitalized for the first seven months of his life. Mother was unable to bond with John during that time. The Department received a referral noting that the hospital had concerns Mother was not bonding with John. Mother explained that the hospital contacted the Department because they "didn't see me there day and night for those seven months every single day." Mother explained that she did not have transportation to the hospital. Both Memorial Hermann Hospital and HealthBridge, a longer-stay facility, reported their concerns about Mother to the Department.

John was originally discharged 30 days after birth. He did not have a feeding tube at the time, but had a heart and lung monitor. When John was about two months old the breathing alarm sounded, and Mother took John to the emergency room. John

had to travel by Memorial Hermann Life Flight to undergo a procedure to restore breathing. John suffered bleeding in the brain, which caused neurological damage. When John was discharged several months later he went to HealthBridge. John was discharged from HealthBridge with an NG-tube, which was a feeding tube inserted in his nose. John was on medication for a blood clot and diuretics to help control the fluid in his lungs.

After being discharged from HealthBridge, John received Early Childhood Intervention (ECI) services. The ECI worker came to John's home weekly until John turned three. After John turned three, he received occupational, speech, and behavioral therapies. Mother received training from the hospital on how to care for John's special needs.

Approximately 30 days after leaving HealthBridge, John had a seizure while being fed and was taken back to Memorial Hermann Hospital. John was hospitalized for another four to five months. Mother testified that she stayed in the hospital four to five times per week. At this time doctors inserted a G-tube in John's abdomen instead of the NG-tube. Mother was instructed on feeding John with the G-tube and care of the G-tube. Mother was also trained on how to replace the G-tube button if John pulled it out or it otherwise became dislodged. The food used by the G-tube was delivered to Mother's home and paid for by Medicaid. By the time John was discharged from Memorial Hermann he was almost one-year old.

John continued to require occasional hospitalization for lung infections, but eventually was able to recover with shorter stays. After about a year, John could mostly recover with medication rather than admission to the hospital. When John was almost two-years old and George was three, Mother moved in with Grandmother. Mother lived with Grandmother for approximately one year, then moved into a one-bedroom apartment.

11

When the Department asked Mother about the injuries John incurred that led to the Department's referral in this case, Mother invoked her Fifth Amendment right against self-incrimination due to the pending criminal charge. Mother did not testify about the period of time between September 20, 2011, the last time a therapist saw John, and October 2, 2011, the date of the referral. At the time of the final hearing, Mother had a pending criminal charge of injury to a child. While the termination case was pending Mother was arrested for selling alcohol to a minor while working for CVS pharmacy. Mother was fired from CVS after her arrest. The charges for selling alcohol to a minor and injury to a child were pending at the time of the final hearing.

While John was in the hospital for seven months George lived with Grandmother.

Mother testified that she received a family service plan from the Department's caseworker and that she understood the requirements of the plan. Mother completed the "Exceptional Parenting" class and an anger-management class. Mother voluntarily took additional parenting classes. Mother gave the names of her sister, aunt, and mother to be used as a support system. Mother obtained employment and provided her caseworker with proof of employment. Mother contacted her caseworker weekly through phone, text, or email. Mother attended all court hearings, but was not permitted to visit the children. Mother obtained appropriate housing and no longer owned cats. Mother completed the psychosocial evaluation and attended individual therapy.

Mother was ordered to pay child support for both children. Mother paid support to Grandmother when George lived with Grandmother. Mother failed to pay child support for John and stopped paying support when George was removed from Grandmother. Mother received $674.00 per month for John in Supplemental

12

Security Income (SSI) from the Social Security Administration. Mother received $280.00 per month in food stamps and $260.00 per month in child support.

Nicole Franco, the conservatorship caseworker, is a member of the specialized intense unit at the Department, which works with children under three-years old who have been subjected to physical abuse, are near death, or have been the subject of extensive media.

When the children first came into the Department's care, George was placed with Grandmother. The Department conducted a home study on Grandmother to determine whether both children could be placed with her. Grandmother was first asked to obtain a Children's Crisis Care Center (4 C's) report on George, which was to determine his emotional health and assess any therapy he may need. Franco also created a safety plan, which required Grandmother to immediately report any outcries of abuse or neglect and to refrain from discussing the ongoing case with George.

During a home visit, Franco learned that George had been urinating in a closet and had bed-wetting accidents at night. Grandmother did not report these issues until Franco asked about the urine smell in Grandmother's house. At that same home visit, George made outcries of abuse, which caused the Department to request removal of George from Grandmother's home. George told Franco that Grandmother told him Mother did not hurt John and that Grandmother asked George to make a list of "all the bad things" that happened while he was in foster care. Grandmother later sent Franco a letter detailing "bad things" that George reported from foster care. The Department investigated the list and none of those things was found to be true. George was removed from Grandmother's home one month later.

On the day George was removed from Grandmother's home, Franco was driving George to the foster home when he said to her, "Ms. Nicole, I'm tired of

13

having to lie and my mom hurt [John]."

Franco investigated Mother's sister in California as a possible placement for both children. Franco offered a program to the sister called "Fostering Connections," which would help the sister become a licensed foster home and would provide financial assistance to help care for the children. To Franco's knowledge, the sister did not engage in the Fostering Connections program. Franco also investigated the three names listed on the parent-resource form as potential placements. One of the persons did not want the children and the other two had an open Child Protective Services case at the time.

Franco testified that at the time of the final hearing, both children were in a foster-to-adopt home and had bonded with their foster parents. John showed affection with the foster parents more than he did when he came into care. John was toilet trained, was eating a variety of foods, was attending a half-day of school, and increased his physical activities. The foster parents challenged John to allow him to accomplish new tasks. While they cared for John's special needs, they did not allow him to be defined by them. Since being discharged from Texas Children's and placed in foster care, John had not been hospitalized again. Since George had been with the foster family he has increased his bond with his brother, increased his reading skills, and learned to ride a bike.

In contrast, Franco testified, Grandmother seemed to still be prompting George. During one supervised visitation, Grandmother brought George a journal and asked him to write down everything he told his therapist so that she could review it. Grandmother also did not understand the progress John had made. Grandmother brought food for George to the visits, but did not bring food for John despite the fact that John by that time could eat food by mouth. During visitation with the children, Grandmother would "probe" George for information about the foster home. At some

14

of the visitations John would be fed through his G-tube, and Grandmother was very uncomfortable with administration of the G-tube feeding.

With regard to the tasks required by the service plan, Franco testified that Mother was not successfully discharged from individual therapy. Franco also testified that although Mother completed anger-management classes, she did not control her anger when interacting with Franco.

James Frankowski, the Court Appointed Special Advocate, was assigned to the case for over a year before the final hearing. Frankowski testified that Child Advocates, the agency for which he volunteered, recommended termination of Mother's parental rights and naming the Department as managing conservator. In making his recommendations Frankowski reviewed the Department's file including all of the medical records since the children came into care. In recommending that Grandmother not be named managing conservator, Frankowski considered previous substance-abuse issues in the home and history of assaultive or abusive conditions within the home. Frankowski also considered the willingness of the parties to seek out and to complete counseling services as well as the ability to provide a safe and stable protected environment for the children. Frankowski conducted numerous interviews with Grandmother in addition to home visits before he came to this conclusion.[3]

In considering the children's best interest, Frankowski also considered the magnitude, frequency, and circumstances of harm to the children. Specifically, Frankowski noted that John almost died on the day he came into care and "there has been zero discussion on exactly what happened in [Mother]'s house that day when [John] almost died." Frankowski noted there was no accounting for the time between

---

[3] Frankowski testified that he met with Grandmother face-to-face 24 times, in addition to several telephone calls, text messages, and emails.

September 20, 2011 and October 2, 2011.

While the case was pending Frankowski, learned that Grandmother was not truthful about contacting Mother. Grandmother had assured the Department that if she had the children she would not contact Mother. Frankowski learned that Mother and Grandmother had contact throughout the pendency of the case.

Frankowski testified that it was not in the children's best interest to be returned to Mother. Frankowski's opinion was based on the fact that Mother had not taken responsibility for the events that led up to John being hospitalized on the day he came into care. Frankowski met with Mother approximately five times, including three home visits. When Frankowski scheduled a visit in advance. he said the home appeared clean and appropriate. Frankowski made one attempt at an unannounced home visit. Frankowski asked Franco to accompany him on the visit in an effort to foster cooperation between Mother and the Department. Mother refused to allow Frankowski or Franco to enter her home when they appeared unannounced.

Frankowski also investigated other family members to see if the children could be placed with other family members. Frankowski's conclusions were similar to those of the Department that no suitable family members existed who were willing to care for the children.

Frankowski visited the children in the foster home where they were living. Frankowski testified that the children were "absolutely thriving" in the foster home. In the foster home John had been toilet trained, was able to express himself verbally, was active, and was eating solid foods. All these accomplishments were milestones that doctors thought John might never reach.

Frankowski testified that George also improved since coming into foster care. George developed appropriate boundaries regarding strangers and others in his life.

George's discipline improved and he was excelling in school.

John and George shared a bedroom in the foster home. The foster parents treated John and George as their own and helped both of them physically and emotionally. The foster parents had four other children with whom both children were able to interact.

Kathy Berry was George's teacher at Westchase Academy when he was four-years old. John also attended Westchase Academy for a short period of time, approximately two years before the final hearing. When John was attending school, Mother taught the teachers how to feed John through his feeding tube. Berry was not John's teacher and did not know if he showed signs of abuse while at the school.

Debra Gentry, Mother's therapist, saw Mother for several sessions and recommended that Mother receive a psychological evaluation and possibly a psychiatric evaluation to determine whether medication would help address Mother's sadness and anxiety. Gentry employed cognitive behavior therapy to help Mother learn coping skills for different events that might happen in her life. Gentry believed that the sessions would have been more successful if Mother had been permitted to talk about the allegations in the ongoing investigation.

Heather Dupuis, a pediatric occupational therapist at MedCare Pediatric Therapy, testified on Mother's behalf. Dupuis explained that occupational therapy is designed to help children accomplish all the skills they need to function at a normal developmental age. Dupuis evaluated John on August 26, 2011, less than three months before the Department referral on October 2, 2011. At the assessment Mother reported that John had difficulty swallowing, aspiration, Respiratory Syncytial Virus (RSV), pneumonia, chronic lung disease, and a history of developmental delay. Mother further reported that John had lung surgery when he was 12-months old and at 24 months had the G-tube inserted. Although John was

17

three-years old at the time of the assessment, Dupuis assessed his development as that of a child between 12- to 14-months old.

Dupuis made three routine visits to conduct therapy with John. At each visit John displayed anxiety when she arrived. Mother reported that she received a psychological referral to address John's anxiety. Dupuis's last visit was on September 20, 2011, 12 days before the referral. Dupuis noted no bruising or other signs of abuse. Dupuis was scheduled to visit twice per week but Mother canceled several regular therapy visits. Mother also canceled all visits after September 20, 2011.

## D.     Jury Charge and Verdict

The jury charge submitted for both cases included grounds for termination under Family Code sections 161.001(b)(1)(D) & (E) (endangerment) and (O) (failure to comply with the service plan). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O). Additionally, the jury was instructed: "[I]t also must be proved by clear and convincing evidence that termination of the parental rights would be in the children's best interest."

The charge included these instructions:

In determining whether [Mother] engaged in conduct which endangers the physical or emotional well being of [the children][4] and/or in determining whether [Mother] knowingly placed or knowingly allowed [the children] to remain in conditions or surroundings which endangered the physical or emotional well being of [the children]. You may include, but are not limited to, the following in your deliberations.

Endanger means to expose to loss, injury, risk or detriment to place in jeopardy or danger.

[The children] need not witness, observe, or be present during the

_____

[4] The charge separated these instructions giving one instruction for each child. The instructions were identical with the exception of the children's names.

endangering conduct. Although endanger means more than the threat of abstract injury or the possible side effects of a less than ideal family environment, it is not necessary that the conduct be directed at [the children] or that he actually suffers injury of voluntary, deliberate, and conscious course of any conduct that may have the effect of endangering [the children].

[Mother], who by her action or inaction exposes [the children] to or fails to protect [them] from a risk of physical injury or emotional harm engages in conduct that endangers [the children], [Mother] is responsible for the conduct of another person if she solicits, encourage[s], directs, aids or attempts to aid a person that is engaging in endangering conduct with [the children] or if she acquiesces to such endangering conduct and does not take immediate positive steps to protect [them] from the endangering conduct.

Based on these instructions, the jury was asked whether the parent-child relationship between Mother and John and George should be terminated. The jury answered, "Yes." The jury further answered that Grandmother should be appointed managing conservator of both children and that termination of Mother's rights was in the best interest of the children.

The trial court signed final orders of termination of Mother's parental rights based on the predicate findings under Family Code sections 161.001(b)(1)(D), (E) and (O), and that termination of Mother's rights was in the best interest of the children.

## E.    Motions for New Trial

Before the trial court signed final orders, the Department filed motions for new trial in which it alleged that Grandmother had a significant relationship with Mother, which was contrary to Grandmother's testimony at the final hearing. The Department sought a new final hearing on the issue of conservatorship of the children.

Mother also filed motion for new trials in which she alleged that the evidence

19

was legally and factually insufficient to support the trial court's final orders.

The trial court signed final orders terminating Mother's parental rights and naming Grandmother sole managing conservator of the children. On August 2, 2013, the trial court granted the Department's motions for new trial and ordered a new trial on the issue of conservatorship, leaving intact the decision to terminate Mother's parental rights. At that time Mother attempted to appeal the termination of her parental rights. This court dismissed Mother's appeals because the final orders were not final at that time. *See In re J.S.A.-S.*, No. 14-13-00946-CV, 2013 WL 6046041, at *1 (Tex. App.—Houston [14th Dist.] Nov. 14, 2013, no pet.) (mem. op.) (dismissing appeal without prejudice to filing new appeal after trial court signs final order) and *In re G.A.A.-G.*, No. 14-13-00947-CV, 2013 WL 6046044, at *1 (Tex. App.—Houston [14th Dist.] Nov. 14, 2013, no pet.) (mem. op.) (same).

On December 3, 2018, the trial court heard the motions to modify conservatorship. Grandmother requested a jury and the parties appeared. Grandmother, having been given notice of the hearing, did not appear. Grandmother had not appeared at court-ordered mediation or a pretrial hearing. The Department waived its right to a jury and the conservatorship hearing proceeded to the bench. Mother was represented by counsel at the conservatorship hearing. At the beginning of the hearing Mother's counsel announced that his correspondence with Mother had been returned unopened and that he had no other way to contact her. Counsel further stated that Mother had not contacted him to inform him that she wanted to appear.

A judgment of conviction was admitted into evidence at the conservatorship hearing. The judgment reflected that on July 19, 2018, Mother was convicted of injury to a child by omission and sentenced to ten years imprisonment. Mother's sentence was suspended, and she was placed on community supervision for three years.

20

On December 20, 2018, the trial court signed final orders naming the Department as sole managing conservator of the children. On January 5, 2019, Mother filed a pro se request for attorney and notices of appeal. Grandmother has not appealed.

## II.   ANALYSIS

In three issues Mother challenges the legal and factual sufficiency of the evidence to support the jury's findings on the predicate grounds of endangerment and failure to comply with the service plan. Mother does not challenge the sufficiency of the evidence to support the jury's finding that termination is in the best interest of the children.

### A. Standards of review

Involuntary termination of parental rights is a serious matter that implicates fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of terminating the parental relationship, the law in Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re*

*J.F.C.*, 96 S.W.3d at 264.

The heightened burden of proof in termination cases results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (op. on reh'g). We review the legal sufficiency of the evidence by considering all evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.*; *In re D.R.A.*, 374 S.W.3d at 531. However, this does not compel us to disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing burden, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (internal quotation marks omitted). We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

In a proceeding to terminate the parent-child relationship brought under Family Code section 161.001, the petitioner must establish, by clear and convincing evidence, one or more acts or omissions enumerated under subsection 1 of section

161.001(b) and that termination is in the best interest of the child under subsection 2. Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

## B.     Predicate Termination Grounds

The jury made predicate termination findings that Mother committed acts establishing the grounds for termination set out in subsections D, E, and O of Family Code section 161.001(b)(1).

Courts have long recognized that due process "guarantees more than fair process" and "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). One of the most fundamental liberty interests recognized is the interest of parents in the care, custody, and control of their children. *See id*. 530 U.S. at 65–66 ("[T]he custody, care and nurture of the child resides first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.").

Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there also is a finding that termination is in the child's best interest. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Due process requires, however, that when a parent has raised the issue of insufficiency of the evidence to support the jury's findings under Family Code section 161.001(b)(1)(D) or (E), an appellate court must address one of those endangerment findings to ensure a meaningful appeal. *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019); *In re P.W.*, 579 S.W.3d 713, 719 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Due-process and due-course-of-law requirements also mandate that an appellate court detail its analysis for an appeal of termination of parental rights under Family Code section 161.001(b)(1)(D) or (E). *In re P.W.*, 579 S.W.3d at 719. In this case Mother challenges the legal and factual sufficiency of the evidence to support

the jury's findings on the predicate grounds for termination. We, therefore, address the jury's endangerment finding under section 161.001(b)(1)(E).

## C. Endangerment Finding

Although she is somewhat inconsistent in her brief, in Mother's second issue she challenges the legal and factual sufficiency of the evidence to support the jury's finding of endangerment under Family Code section 161.001(b)(1)(E). We will address both the legal and factual sufficiency of the evidence to support the jury's finding.

The trial court's final orders of termination were based on Family Code section 161.001(b)(1)(D) and (E) in addition to subsection O, with the court finding that Mother had:

- Knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child (subsection D); and

- Engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child (subsection E).

Both subsections D and E require proof of endangerment. "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).

Under subsection E, the evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act. *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A court may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex.

24

App.—El Paso 2012, no pet.). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.L.H.*, 515 S.W.3d 60, 92 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

Neglect of a child's medical needs endangers the child. *In re T.M.T.*, No. 14-18-00442-CV, 2018 WL 6053667, at *11 (Tex. App.—Houston [14th Dist.] Nov. 20, 2018, no pet.) (mem. op.). A parent's failure to provide appropriate medical care for a child may constitute endangering conduct for purposes of subsection E. *Id.*

Evidence of abuse of one child is sufficient to support a finding of endangerment with respect to other children. *In re T.L.E.*, 579 S.W.3d 616, 624 (Tex. App.—Houston [14th Dist.] 2019, pet. filed); *In re R.W.*, 129 S.W.3d 732, 742 (Tex. App.—Fort Worth 2004, pet. denied). Violent or abusive acts directed toward one child can endanger other children that are not the direct victims of the abuse in question and support termination of parental rights as to the other children. *In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *16 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.). Courts of appeals have consistently held in termination cases that evidence a parent has sexually or physically abused a child not subject of the termination action also constitutes evidence of endangerment to the child subject to the termination action. *In re E.A.K.*, 192 S.W.3d 133, 150–51 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

On October 2, 2011, the day of the initial referral, John was three years old. As noted by the attending physician, Graf, John was "a frail, poorly nourished looking child who was on a breathing machine, who had multiple marks all over his body." John came to the hospital in organ failure and severely dehydrated. In addition to bruising all over John's body, blood tests revealed John had not been receiving regular nutrition. When John was admitted to the hospital he was not

expected to live through the night. In Graf's opinion John's injuries were caused by child abuse and could not have been caused by anything else.

Since coming into the care of the Department and living with foster parents John has not been hospitalized, learned to feed himself, and was able to walk and play with his sibling and foster siblings. He has developed mentally and physically beyond the doctors' expectations in foster care.

The record reflects that George was not physically abused as was his brother. This court has held that violent or abusive acts directed toward one child can endanger other children that are not the direct victims of the abuse in question and can support termination of parental rights as to the other children. *In re T.L.E.*, 579 S.W.3d at 624. The jury could have inferred from Mother's abuse of John and her medical neglect of John that George was endangered by continuing to live with Mother.

Viewing the evidence in the light most favorable to the jury's findings, we conclude that the jury reasonably could have formed a firm belief or conviction that Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E).

Mother argues there is contradictory evidence that does not support the jury's verdict. Specifically, Mother points to Macia's testimony that she never saw signs of physical abuse of John, John received ECI services and occupational-therapy services, and that George did not have any signs of physical abuse. Macia, John's regular pediatrician, did not observe signs of physical abuse until John was in the hospital near death. To be sure, Mother engaged in certain services such as physical and occupational therapy to aid John's development. That evidence must be weighed against overwhelming medical evidence of severe physical abuse and neglect. As

26

addressed by this court before, the jury could have inferred from the abuse suffered by John that George was also in danger. *See In re T.L.E.*, 579 S.W.3d at 624.

Mother further argues that George's allegedly hearsay statements that Mother was hurting John "were the only direct evidence tying [Mother] to John's injuries." Mother contends that the following two statements by George as told to Holmes and Franco were inadmissible hearsay. First, Holmes testified that Gordon told him that John "had been locked in the closet by his mother and she would walk over to his crib and hit [John] and she pressed his arm like this (indicating)." Mother timely objected to hearsay and the trial court overruled the objection. During Holmes's testimony the trial court overruled the hearsay objection without a response from the Department. Second, Franco testified that George "stated that he was talking with his therapist about lying and that it's not okay to lie and he then stated 'Ms. Nicole, I'm tired of having to lie and my mom hurt [John].'" Before Franco testified, the trial court held an extensive hearing outside the presence of the jury to determine whether George's statements made to Franco were admissible as exceptions to hearsay. At the hearing the Department argued that Franco's testimony about George's statements was admissible under the excited utterance exception to the hearsay rule or as outcry statements under Family Code section 104.006. *See* Tex. R. Evid. 803(2); Tex. Fam. Code Ann. § 104.006.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d). The proponent of hearsay has the burden of showing that the testimony fits within an exception to the general rule prohibiting the admission of hearsay evidence. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 908 n.5 (Tex. 2004).

Assuming the trial court erred in admitting the allegedly hearsay statements,

27

Mother cannot obtain reversal of the final orders unless she shows that the error amounted to such a denial of her rights as was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). "To put it another way, a successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted." *A.B. v. Texas Dep't of Family & Protective Servs.*, No. 03-17-00658-CV, 2018 WL 1220894, at *5 (Tex. App.—Austin Mar. 9, 2018, no pet.) (mem. op.) quoting *Texas Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). In making this determination, the court must review the entire record. *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870. The erroneous exclusion or admission of evidence "is likely harmless if the evidence was cumulative, or the rest of the evidence was so one-sided that the error likely made no difference in the judgment." *A.B.*, 2018 WL 1220894, at *5.

The record reflects that George's statements of Mother's physical abuse were cumulative of other evidence that was admitted without objection. As detailed above, the record reflects that John suffered severe physical abuse through the bruises, scratches, and ligature marks on his body at the time he was admitted into the hospital. Several photographs were admitted into evidence showing all of those injuries. John also suffered medical neglect to the extent that he was near death at the time Mother called 9-1-1. There was also proof that Mother waited until John was lifeless and near death before calling 9-1-1. Graf testified that John's injuries were caused by abuse and nothing else.

Mother did not testify to the events that occurred within the 12 days before John was hospitalized because a charge of endangerment to a child was pending at the time of the offense. Mother admitted, however, that she lived alone with her two

28

children and several cats. Dupuis, the occupational therapist, testified that she last saw John on September 20, 2011. Grandmother testified that she saw John two hours before Mother called 9-1-1 on October 2, 2011, but also testified that she was not allowed into Mother's house. Grandmother testified that she could see John in a playpen while she was standing at the front door. In reviewing the entire record, we hold that any error in admitting hearsay statements made by George was harmless. *See In re R.H.W. III*, 542 S.W.3d 724, 737 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (holding any error in admission of hearsay was harmless when evidence included unobjected-to evidence containing same or similar information). Other evidence connected Mother to the abuse of John.

Viewing the evidence in a neutral light, we conclude that the jury could have formed a firm belief or conviction that Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Further, we conclude that the jury could have reconciled any disputed evidence in favor of finding that Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, or any disputed evidence was not so significant that the jury could not have reasonably formed a firm belief or conviction that Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children. We overrule Mother's issue one challenging the jury's findings on the predicate grounds for termination under Family Code section 161.001(b)(1)(E).

### III.   CONCLUSION

The evidence is legally and factually sufficient to support the jury's findings

of endangerment as to Mother under section 161.001(b)(1)(E). Having made this determination, we need not address issues two and three concerning the other predicate grounds for termination under Family Code section 161.001(b)(1)(D) and 161.001(b)(1)(O). Mother has not challenged the jury's findings that termination of her parental rights was in the children's best interest.

Having addressed every issue raised and necessary to the disposition of the appeals, we affirm the final orders of termination as challenged. See Tex. R. Ap. 43.2(a), 47.1.

/s/　　Charles A. Spain
　　　　Justice

Panel consists of Justices Christopher, Spain, and Poissant.

30